UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LAWRENCE GUINYARD,

                Petitioner,

      -vs-

ROBERT KIRKPATRICK,
SUPERINTENDENT OF
WENDE CORRECTIONAL FACILITY
AND THE ATTORNEY GENERAL OF
NEW YORK STATE

                Respondent.

_____

**DECISION AND ORDER**

**No. 11-CV-06352(MAT)**

## I.   Introduction

*Pro se*[1] Petitioner Lawrence Guinyard ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered August 6, 2008, in New York State, Supreme Court, Erie County, convicting him, upon a jury verdict, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25[1]) and

---

[1]

     When Petitioner initially filed his habeas petition (Dkt. No. 1) and supporting memorandum (Dkt. No. 2) on July 15, 2011, he was unrepresented. On July 26, 2011, Petitioner moved to have counsel appointed in the instant proceeding, asserting that the habeas petition had been drafted by an inmate law clerk at the facility where Petitioner was incarcerated because Petitioner is mentally retarded and cannot read and write. See Dkt. No. 4. The Court granted Petitioner's motion and appointed attorney Brian Shiffrin, Esq. on July 28, 2011. See Dkt. No. 5. On November 10, 2011, attorney Shiffrin filed a memorandum in support of the habeas petition and reply to Respondent's opposition. See Dkt. No. 12.

Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[1]).

## II.  Factual Background and Procedural History

Under Erie County Indictment No. 01004-2007, Petitioner was charged with  one count of Murder in the Second Degree (Penal Law § 125.25[1]) and one count of Criminal Possession of a Weapon in the Third Degree (Penal Law § 265.02[1]).  See Ind. No. 01004-2007, dated 05/11/07 at Resp't Ex. B.

Tieshawn Pettigrew ("Pettigrew") testified that in April of 2007 she lived in apartment 1 of a four-unit apartment building at 148 Blaine in the City of Buffalo, New York with her fiancee, Demetrius Stewart ("Stewart"), and her three children.   Trial Trans. [T.T.] 492-494.   McAllister lived across the hall from Pettigrew in apartment 2.  T.T. 496.  On the morning of April 18, 2007, Pettigrew received a call from an upstairs neighbor informing Pettigrew that there was a diabetic kit and mail at the back door of Pettigrew's apartment.  T.T. 497.  Prompted by that phone call, Pettigrew observed the items outside her door and noticed that the mail was addressed to McAllister.  T.T. 499-500.  Pettigrew and Stewart then called the police who responded shortly thereafter, entered McAllister's apartment, and told Pettigrew "that the lady was in there dead."  T.T. 500.  The Buffalo Police Homicide Unit took Pettigrew and Stewart to police headquarters for questioning. T.T. 500.   After police ended questioning Pettigrew, she left the

police station.  T.T. 501.  At the request of police, Stewart gave a bucal swab for a DNA sample.  T.T. 507.

Lance Huddleston ("Huddleston") testified that at the time of the murder he lived in upstairs apartment 4 at 148 Blaine. T.T 517-518.  When questioned by police, Huddleston told them that he had been with a friend the night before at Voelker's Bowling Alley and the New Humboldt Inn.  T.T. 520-521.  Huddleston testified that he came home around 4:30 a.m., saw the diabetes kit in the hallway, and "moved it to the side because [he] had noticed that it had syringes in it. . . ."  T.T. 522.  He then went up to his apartment and went to sleep.  T.T. 522.  At approximately 7:00 a.m., Huddleston's female friend called him to come open the door to the apartment building, which he did.  T.T. 525.  As he was walking to the door of the apartment building, he noticed that the front door to McAllister's apartment was slightly ajar.  T.T. 526. Huddleston accompanied his female friend from the door and the two then went upstairs.  T.T. 526.  After McAllister's body was discovered, Huddleston and his female friend were questioned by police.  T.T. 520.  At the request of the police, Huddleston gave a bucal swab for a DNA sample.  T.T. 531.

Buffalo Police Department ("BPD") Detective James Maroney was the crime scene investigator for the murder.  T.T. 553.  Detective Maroney testified that McAllister's body was found lying face down in the doorway of her bedroom.  T.T. 557.  Yellow residue from the

discharge of a fire extinguisher was found throughout the apartment. T.T. 556-557. Detective Maroney recovered a black polymer knife and dentures from the crime scene. T.T. 557. Blood stains were found on the kitchen floor. T.T. 557. Detective Maroney took photographs of various items at the murder scene, including the victim's mail, the diabetic kit, footprints in the discharge from the fire extinguisher, and the indentation on the victim's finger where she had worn a ring. T.T. 556-557, 569-570, 585.

BPD Detective Daniel Rinaldo developed a lead in the investigation of McAllister's murder when he received a call on April 23, 2007 from Matthew Lowe ("Lowe"), the proprietor of the Blessed Variety Store located at 291 East Delevan. T.T. 666-667. Lowe told Detective Rinaldo that he bought two rings and a DVD player from a black male, who he knew as "New York", who frequented his store. T.T. 668, 679. Lowe told Detective Rinaldo that he paid $20 for the rings and $40 for the DVD player. T.T. 668. Lowe described "New York" to Detective Rinaldo as a black male in his late forties, standing five feet ten inches, weighing approximately 175 lbs. T.T. 668. Detective Rinaldo asked Lowe to bring the rings and the DVD player down to police headquarters, which Lowe did about one hour later. T.T. 669. Police subsequently took the items to some of the victim's family members for identification purposes. T.T. 670. The victim's grandson, Kelly Craig, was not

able to identify the items as his grandmother's.  T.T. 670.  Brenda Taylor, the victim's daughter, identified one of the rings as her mother's.  T.T. 670.  Nicole Brooks, the victim's granddaughter, identified one of the rings and the DVD player as belonging to McAllister.  T.T. 671.

Police reviewed photos with Lowe while he was at headquarters and then set out to look for Petitioner at his last known address, 250 Humboldt Parkway.  T.T. 696.  Detectives Michael Mordino, Rinaldo and Michael Acquino located Petitioner at this address, and Petitioner agreed to come to the police station for questioning. T.T. 696.  Detective Mordino testified that in the police car on the way to the station, Petitioner spontaneously stated, "I bet this is about the woman from the side of Humboldt that was killed. I used to do some work for her . . . ."  T.T. 700.

At the station, Petitioner was read his <u>Miranda</u> rights and agreed to sign a "rights card" indicating that he understood the right to remain silent but was waiving it.   T.T. 701-703. Petitioner then proceeded to give a four page statement that was read back to him.  T.T. 704, 711.  Petitioner stated that he had done some work as a handyman for McAllister about three months ago. T.T. 707.  Petitioner also stated that McAllister had called him that winter and complained about "the guy upstairs from her." T.T. 709.  Following the interview, Petitioner agreed to give police a DNA sample and to submit his clothing, including his

footwear, for analysis. T.T. 711-712. Petitioner was given a white paper outfit to wear after his clothing was removed. T.T. 712. Detective Mordino then initiated a second conversation with Petitioner. T.T. 713. He showed Petitioner photographs of individuals who had been arrested on Blaine. T.T. 713, 719. Detective Mordino also told Petitioner he had been identified as the person who sold McAllister's rings and DVD player. T.T. 714. Petitioner initially denied that he had possessed the items belonging to McAllister, but subsequently told Detective Mordino that he found the rings and the DVD player in a flower pot on Blaine. T.T. 714. Detective Mordino then indicated to Petitioner that they had a video from a Canisius College security camera, of a black male on a bicycle which was next to the victim's house. T.T. 715. The police did not, however, have this video to show Petitioner when Petitioner insisted that Detective Mordino "show him the proof." T.T. 715. Detective Mordino then asked Petitioner if he had been in McAllister's home, to which he responded in the negative. T.T. 716. Detective Mordino indicated to Petitioner that the footprints found at the crime scene matched the prints on Petitioner's boots, and showed Petitioner the photographs of the footprints. T.T. 716-717. After seeing the photographs, Petitioner stated "they look like mine." T.T. 717. At that point, Petitioner changed his story and told Detective Mordino that he was riding his bike near McAllister's apartment building when he saw her arguing

with a black male on the street.  T.T. 716-717.  Petitioner stated that he went to see "what was going on" and that everything appeared "okay" and he left.  T.T. 718.  Detective Mordino testified that at no time during the interview was Petitioner threatened or promised anything, nor did Petitioner appear to have any difficulty understanding what was taking place.  T.T. 720.  He further testified that Petitioner was offered food, drink, and cigarettes throughout the interview.  T.T. 721.

Detective Acquino, who was primarily involved in interviewing Petitioner along with Detective Mordino, testified that when Petitioner was brought to police headquarters, he was read his Miranda rights and waived those rights.  T.T. 747.  Detective Acquino testified that Petitioner initially denied selling the rings and the DVD player to Lowe, but then changed his story and indicated that he did sell these items after finding them in a flower pot on Blaine.  T.T. 748-750.  Detective Acquino testified that when confronted with his inconsistent answers, Petitioner told the detectives that he did not want to speak with them anymore, wanted an attorney, and stated that, "the more I talk, the more I get into trouble."  T.T. 752.  At this point, the detectives stopped the interview.  T.T. 752.  The detectives left the room and about fifteen minutes later another detective, who had been observing the interview through a two-way mirror, told Detective Acquino that Petitioner was lying on the floor.  T.T. 753.

Detective Acquino returned to the interview room to find Petitioner curled up on the floor in a fetal position and repeating, "I'm sorry, I'm sorry." T.T. 753. Detective Acquino testified that he asked Petitioner if he was okay, and, upon Petitioner's request, gave Petitioner a cigarette. T.T. 753. Petitioner asked that Detective Acquino sit with him while he smoked the cigarette and he agreed. Petitioner then initiated a conversation with Detective Acquino and stated that he had "lied." T.T. 753-754. Petitioner told Detective Acquino that he was on the street the day of the murder and saw the door to McAllister's apartment open. T.T. 754. Petitioner told Detective Acquino that his footprints were found in her apartment because he entered her apartment and saw that McAllister was dead. T.T. 754. Petitioner also told Detective Acquino that he had taken the rings and the DVD player from McAllister's apartment. T.T. 754. Detective Acquino testified that he did not ask any questions of Petitioner while Petitioner was talking to him, and that all of the statements Petitioner made were spontaneously volunteered. T.T. 754.

Christopher Chisholm ("Chisholm"), an inmate at the Erie County Correctional Facility, spoke with Petitioner while they were housed together there. T.T. 781, 784. Chisholm testified that Petitioner told him that he went to McAllister's apartment to talk to her about doing some work, and she declined his services. T.T. 782. Chisholm testified that Petitioner told him, "that's

when it all happened." T.T. 782. According to Chisholm, Petitioner choked McAllister with his hands and then stabbed her with a knife. T.T. 782. Petitioner also told Chisholm that he took McAllister's rings and sold them. T.T. 809-811. Chisholm testified that he subsequently wrote a letter to then district attorney Frank Clark relaying this information. T.T. 784. Chisholm stated in the letter that he knew the victim's family and was not looking for anything in return for the information. T.T. 784-785.

Forensic serologist Mark Kalinowski ("Kalinowski") testified that he tested blood stains found on Petitioner's sweatshirt. T.T. 902. He testified that the blood found on the sweatshirt matched the victim's genetic profile, and that the chances that the blood did not belong to McAllister was one in two hundred eighty-three quadrillion. T.T. 904. Kalinowski testified further that he swabbed the collar of the sweatshirt and that "the major profile that was obtained . . . is the same DNA profile obtained from the known buccal sample of [Petitioner]." T.T. 905. Kalinowski testified that the chances that the blood swabbed from the collar of the sweatshirt was not Petitioner's blood was one in two point seventeen quadrillion. T.T. 904.

Forensic chemist Michelli Schmitz ("Schmitz") testified that she was qualified in footprint comparison. T.T. 949. Schmitz testified that after examining Petitioner's sneakers and the

footprints found at the crime scene, she determined that they were the same.  T.T. 959.

Petitioner testified in his defense; and stated that he had known McAllister for approximately one year, and had worked for her infrequently by doing odd jobs, including shoveling snow. T.T. 964-965.  That, on April 18th, he went to McAllister's home, entered her apartment, and found her dead on the floor.  T.T. 965. He testified that he became nervous and ran out of the house and on his way out, he found a ring on the ground "down the driveway" and a "little walkman."  T.T. 966.  On cross-examination, Petitioner denied ever being in the victim's room, despite detectives finding footprints matching his boots there.  T.T. 982-983.  He also denied selling a DVD player to Lowe, maintaining that it was a "walkman" instead that "takes DVDs . . . ."  T.T. 986-988.

At the end of his trial, the jury found Petitioner guilty as charged.   T.T.  1147.   He  was  subsequently  sentenced  to  an indeterminate period of imprisonment of twenty-five years to life on the murder conviction and a concurrent indeterminate term of imprisonment of two and one-third to seven years on the weapons possession  conviction.   Sentencing  Mins.  of  08/06/08  8-9; Resentencing Mins. of 09/29/08 2-4.

Petitioner  appealed  his  judgment  of  conviction  to  the Appellate Division, Fourth Department on the following grounds: (1) the trial court erred in denying his motion to suppress his

statements to police; (2) that he was denied a fair trial due to a Brady violation; (3) the verdict was against the weight of the evidence; (4) ineffective assistance of counsel; and (5) his sentence was harsh and excessive. See Pet'r Br. on Appeal, Points I-V at Resp't Ex. B. The Appellate Division, Fourth Department affirmed the judgment of conviction on April 30, 2010, and leave to appeal was denied. People v. Guinyard, 72 A.D.3d 1545 (4th Dep't 2010), lv. denied, 15 N.Y.3d 805 (2010).

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) the trial court erred in denying his motion to suppress his statements to police; (2) that he was denied a fair trial due to a Brady violation; (3) that the evidence was legally insufficient to support his conviction; and (4) ineffective assistance of counsel. See Pet., Points I-IV (Dkt. No. 1); Mem. of Law (Dkt. No. 3); Mem. & Legal Authority in Support of Petition for Writ of Habeas Corpus and Reply to Respondent's Filings in Opposition ("Reply") (Dkt. No. 12).

For the reasons that follow, the writ of habeas corpus is denied and the petition is dismissed.

### III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28

U.S.C. § 2254(b)(1)(A);   see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999);   accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).  With the exception of Petitioner's legal sufficiency claim —- which is raised for the first time in the instant habeas petition —- Petitioner's claims are exhausted and properly before this Court.

## IV.  The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

**V.    Analysis of the Petition**

**1.    Legally Insufficient Evidence (Ground Two)**

Petitioner claims in ground two of the petition, that the evidence was legally insufficient to support his conviction. See Pet. at 16-19; Mem. of Law at 2-3. This claim, which is raised for the first time in the habeas petition, is unexhausted but deemed exhausted and procedurally defaulted from habeas review.

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). Petitioner failed to raise this claim in the state courts either on direct appeal and/or through a collateral attack. Consequently, the claim is unexhausted for purposes of federal habeas review. Nonetheless, Petitioner no longer has a state court forum in which to exhaust this claim. Petitioner has already used his one right to appeal and he is precluded from collaterally attacking this record-based claim in a motion to vacate his judgment of conviction. See N.Y. Court Rules § 500.20(a); N.Y. Crim. Proc. Law ("CPL") § 440.10(2)(c) (court must deny motion to vacate where record-based claim could have been raised on direct appeal but unjustifiably was not). Accordingly, the Court deems Petitioner's unexhausted sufficiency of the evidence claim exhausted and procedurally

-13-

defaulted from habeas review.  <u>See</u> <u>Grey</u>, 933 F.2d at 120-21 ("[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'") (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 263 n.9 (1989)).

Despite the procedural default, this Court may review the merits of Petitioner's claim if he can show "cause" for his failure to raise the claim in the state courts and "actual prejudice" resulting therefrom, or, that failure to review the claim will result in a "fundamental miscarriage of justice."  <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 485, 496 (1986);  <u>see also</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995) (introduction of new evidence of innocence is essential to establish a "fundamental miscarriage of justice" to allow a federal court to reach the merits of a barred habeas claim).  Petitioner has not alleged cause and prejudice for the default.  Moreover, he has failed to allege facts sufficient to avail himself of the "fundamental miscarriage of justice" exception.  Accordingly, this claim is procedurally defaulted from habeas review and denied on that basis.

## 2.  <u>Brady</u> Claim (Ground One)

At ground one of the petition, Petitioner argues, as he did on direct appeal,[2] that he was denied his right to a fair trial and

---

[2]

The Appellate Division determined as follows: "[d]efendant contends that he was denied a fair trial based on the court's failure to impose any sanctions upon the People for their delay in turning over <u>Brady</u> material.  The record

due process by the prosecution's delay in providing exculpatory material in violation of the principles enunciated in Brady v. Maryland, 373 U.S. 83 (1963).  Specifically, he argues that the prosecution failed to timely disclose a tape-recorded conversation between the victim and her incarcerated husband, as well as two related "P-73" report forms[3] authored by BPD Detective Mary Evans. See Pet., Point I; Mem. of Law at 1-2; Reply at 6-9.  The Appellate Division adjudicated this claim on the merits, and the AEDPA therefore applies.  Under that standard, Petitioner's claim is meritless.

"Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  When a habeas claim is based on belated disclosure of Brady information, rather than non-disclosure of such

establishes, however, that defendant had a meaningful opportunity to use that material and, in any event, his failure to request such sanctions renders his contention unpreserved for our review."  People v. Guinyard, 72 A.D.3d at 1546 (internal citations omitted).

[3]

At trial, Detective Evans testified that a "P-73" report form "is a memoralization of whatever activity you might have done that day."  T.T. 853.

information, a petitioner is not entitled to reversal, even if the information is deemed material, "unless he can show that the delayed disclosure caused him prejudice." United States v. Diaz, 922 F.2d 998, 1007 (2d Cir.), cert. denied, 500 U.S. 925 (1991). Petitioner cannot meet this standard.

The record reflects that during the second day of jury selection, the prosecutor provided defense counsel with Rosario material, which included, inter alia, two P-73 police report forms authored by BPD Detective Evans.  T.T. 276-279.  On the record, defense counsel acknowledged receipt of the documents.  T.T. 280. The first P-73 revealed that Detective Evans had spoken to an investigator at Washington Correctional Facility and that he had informed her that a taped recording of a phone call that occurred the night before the murder between the victim and her incarcerated husband, Irvin McAllister, existed.  The second P-73 revealed that Detective Evans had subsequently met with Irving McAllister and that he had told her that his wife had been threatened with a knife by the woman who lived across the hall, and that the victim had complained to him that she was having problems with her upstairs male neighbor.  T.T. 756-759.  Subsequently, after the trial had begun and after Pettigrew and Huddleston had testified, defense counsel stated, on the record, that "[he] had not thoroughly reviewed the documents (previously provided to him on the second day of jury selection) with regard to [Detective Evans] and it was

over the lunch period on Monday that [he] came across two pieces of paper that was within this stack of those documents. [One of them] – they're both P-73s." T.T. 757. Defense counsel argued that the taped conversation was <u>Brady</u> material and that he should be allowed to play the taped conversation to the jury and to call the victim's husband as a witness. T.T. 759. The prosecution argued that the tape was not <u>Brady</u> material, and the trial court, after reviewing the tape, determined that it was not and precluded the defense from playing the tape to the jury. T.T. 760, 764-766. The trial court, however, stated that it would consider permitting defense counsel to call Irving McAllister to testify. T.T. 769-770. In conjunction with the court's statements, the prosecutor noted that "[i]n addition to the remedy of allowing [defense counsel] to recall [Pettigrew and Huddleston] that he is trying to claim are the real killers here and to allowing him leeway to recall them and re-question them in a broader manner, another obvious remedy is to call Detective Evans, which he's indicated he's going to do, and to ask specifically about this conversation with this guy who's in custody concerning his hearsay." T.T. 769-770. The following day, defense counsel stated, on the record, that, if the court was amenable to it, he would refrain from calling Irving McAllister to testify so long as he was permitted to elicit hearsay testimony from Detective Evans with respect to the information contained in the P-73 report forms. T.T. 834-835. The court indicated that it

was amenable to this arrangement, and defense counsel thereafter called Detective Evans as a witness and asked her about Irving McAllister's statements. T.T. 855-857. Detective Evans testified, in pertinent part, that, "Mr. McAllister told me . . . she was angry that the male that lived in the upper dropped some weights on the floor in the middle of the night. And also the girl in the lower front had -- after Ms. McAllister had complained about the woman in the front lower slamming her door, that the girl had responded by pulling a knife and cussing her out, that's quote." T.T. 855-856.

Petitioner argues that the information at issue was material and that the mid-trial disclosure of it impeded the ability for the information to be effectively used. Even *assuming arguendo* that the information constituted <u>Brady</u> material, Petitioner has not and cannot establish prejudice (i.e., that his attorney did not possess the evidence in time for its effective use at trial). Initially, the P-73 police report forms were provided to defense counsel on the second day of jury selection. Nonetheless, Petitioner argues that "the People's delay in providing the <u>Brady</u> material . . . seriously impeded counsel's preparation for trial since both Pettigrew and Huddleston had already testified for the people." Pet. at 12. Indeed, the record reflects that defense counsel admitted that he had not thoroughly reviewed the P-73s until mid-trial (after Pettigrew and Huddleston had already testified).

However, the record also reflects that fairly extensive discussions between the court and the parties were conducted on this issue in which defense counsel was afforded the opportunity to recall Pettigrew and Huddleston and  also to call Detective Evans in place of Irving McAllister himself.  Defense counsel declined to re-call Pettigrew and Huddleston and instead elected to call Detective Evans and questioned her about the substance of the P-73 police reports, eliciting from her the same information that he wished to elicit through Irving McAllister.  Thus, Petitioner's counsel made effective use of the information contained in the P-73 reports at trial, and the Court cannot therefore find that there is a reasonable probability that earlier disclosure of the information would have changed the outcome of the proceeding.  Petitioner's <u>Brady</u> claim is therefore meritless.

Accordingly, the state court's adjudication of this claim was neither contrary to or an unreasonable application of settled Supreme Court law.  Nor can it be said that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  The claim is therefore denied.

**3. Trial Court Erred in Denying Petitioner's Motion to Suppress Petitioner's Statements to Police (Ground Three)**

At ground three of the petition, Petitioner argues, as he did on direct appeal,[4] that the trial court erred in denying his motion to suppress his statements to police. Specifically, he claims that his statements to homicide detectives were involuntary because he is mentally retarded and unable to read and write and therefore was not "capable of understanding the consequences of waiving his constitutionally protected right to remain silent and his right to an attorney . . . ." See Pet., Point III. The Appellate Division adjudicated this claim on the merits, and the AEDPA therefore applies. Under that standard, Petitioner's claim is meritless.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (citing Arizona v. Fulminante, 499 U.S. 279, 287 (1991)); see also Mincey v. Arizona, 437 U.S. 385, 396 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; "[i]nstead, this Court is under a duty to make an independent evaluation of the record"). Factual questions

---

[4] The Appellate Division held as follows: "[c]ontrary to the further contention of defendant, the court was not required to suppress his statements based on his mental disabilities. The intelligence of a defendant is only one factor to be considered by a court when determining whether his or her waiver of Miranda rights was voluntary. Here, the evidence presented at the suppression hearing established that defendant understood the meaning of the Miranda warnings prior to waiving his rights." Guinyard, 72 A.D.3d at 1546 (internal citations and quotations omitted).

underlying a legal determination are entitled to a presumption of correctness under 28 U.S.C. § 2254(d); Nelson, 121 F.3d at 833-34. Specifically, this Court is required to give deference to the state court's factual determinations, and petitioner bears the burden of rebutting those determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir. 2001) (holding that under AEDPA, "'a determination of a factual issue made by a State court shall be presumed to be correct[, and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence'" (quoting 28 U.S.C. § 2254(e)(1))). However, the Second Circuit has noted that the "statutory presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." Nelson, 121 F.3d at 833 (citation and internal quotation omitted). Thus, "[i]f the material facts were not adequately developed at the State court hearing or the District Court finds that the factual determination is not fairly supported by the record, the presumption of correctness is set aside." Id. (citation and internal quotation omitted). When evaluating the voluntariness of a confession, no one factor is determinative; rather, the totality of the circumstances must be evaluated. Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988). The factors to be considered include (1) the characteristics of the accused, (2) the

conditions of the interrogation, and (3) the conduct of law enforcement officials. Id. at 901-02.

Petitioner argues that, due to his mental retardation and his inability to read and write, he was unable to knowingly waive his Miranda rights. However, low IQ by itself does not render the waiver involuntary. Instead, for a waiver of Miranda rights to be deemed involuntary, an individual must be "so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987) and citing Toste v. Lopes, 701 F. Supp. 306, 313-14 (D. Conn. 1987), aff'd, 861 F.2d 782, 783 (2d Cir. 1988) (per curiam) (although psychological testimony indicated that petitioner was 'mildly retarded' and of 'dull normal intelligence,' the evidence did not show an inability to knowingly waive his rights")); see also Clark v. Mitchell, 425 F.3d 270, 283-84 (6th Cir. 2005) ("[Borderline retardation . . . or 'low average intellect' . . . is not dispositive" of the voluntariness of a defendant's waiver of his constitutional rights); People v. Williams, 62 N.Y.2d 285, 287 (1984) (a borderline mentally retarded man was capable of waiving his constitutional rights).

Here, there is more than sufficient evidence to support the state court's determination, under the totality of the circumstances, that Petitioner voluntarily made incriminating

statements after being advised of his <u>Miranda</u> rights. In particular, the following evidence from Petitioner's pre-trial suppression hearing regarding the circumstances of the questioning supports the reasonableness of that determination: (1) Petitioner agreed to accompany police to headquarters for questioning; (2) Detective Acquino advised Petitioner of his <u>Miranda</u> warnings and Petitioner said he understood them; (3) Petitioner said that he was illiterate and the interviewing detectives took steps to insure their questions and his answers; (4) during the interview, Petitioner was not restrained in any way, he was offered food and drink, and no promises or threats were used and no coercion was used; (5) Petitioner did not invoke his right to remain silent or his right to counsel before making the statements to police; (6) Petitioner changed his story several times after being confronted with incriminating evidence and finally asked for a lawyer at 12:45 a.m.; (7) the police immediately ceased their questioning upon Petitioner's assertion of his right to counsel; (8) Petitioner proceeded to make further statements to the interviewing detectives without prompting or any questions being asked of him; (9) Petitioner has 10 prior arrests dating back to 1987. <u>See</u> Suppression Decision at 2-4 at Resp't Ex. B. In addition, with respect to Petitioner's mental capacity, it was established at the pre-trial suppression hearing that Petitioner was articulate and coherent when answering the detectives'

questions, that he did not appear confused or unknowing, that he lived with his girlfriend for three and a half years, that he had significant exposure to the criminal justice system with ten prior arrests dating back to 1974, and that he asserted his right to counsel once he was confronted with incriminating evidence by the detectives.  Based upon all of this evidence, there was sufficient evidence to refute the claim that Petitioner's IQ was low enough to invalidate his waiver.  In short, there is no basis to disturb the state court's finding after a full hearing on this issue that Petitioner was properly given <u>Miranda</u> warnings, and his waiver was voluntary.

In sum, the Court concludes that the trial court's determination of Petitioner's claim, as affirmed by the Appellate Division, was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Petitioner's claim is meritless and therefore denied.

## 4.   Ineffective Assistance of Counsel (Ground Four)

At ground four of the petition, Petitioner argues, as he did on direct appeal,[5] that he was deprived of his right to effective

---

[5]    The Appellate Division rejected this claim on the merits, finding that: "[w]e reject the further contention of defendant that he was denied effective assistance of counsel.  To the extent that defendant contends that defense counsel failed to make certain motions, it is well settled that the failure to make motions with little or no chance of success does not constitute ineffective assistance of counsel.  Viewing the evidence, the law and the circumstances of this case in totality and as of the time of the representation, we conclude that defense counsel provided meaningful representation." <u>Guinyard</u>, 72 A.D.3d at

assistance of counsel.  Specifically, he claims that counsel was ineffective because he:   (1) he failed to investigate the information contained in the P-73 police reports; (2) failed to make an "adequate" motion to dismiss for legal insufficiency at the close of the People's case; and (3) failed to challenge the credentials of two of the prosecution's expert witnesses, Schmitz and Vertes.  See Pet., Point IV; Mem. of Law at 4-5; Reply at 9-12. The Appellate Division adjudicated this claim on the merits, and the AEDPA therefore applies.  Under that standard, Petitioner's claim is meritless.

In order to establish that he received the ineffective assistance of trial counsel, Petitioner must show both that his attorney provided deficient representation and that he suffered prejudice as a result.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that counsel's conduct "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result."  Id. at 686, 688.  Prejudice has occurred where there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  Although the

---

1546-57 (internal citations omitted).

Strickland standard is two-pronged, a reviewing court need not address both.  See id. at 697 (noting that most ineffectiveness claims falter on the prejudice prong and stating that where a court can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," which will often be the case, the court should do so).

**(A)   Failure to Investigate Information Contained in P-73s**

Petitioner argues that he received ineffective assistance of trial counsel due to counsel's failure to investigate the information contained in the P-73 police reports.  He argues that, "[a]fter receiving this information[,] defense counsel neither met with Mr. McAllister to learn precisely and directly what his wife had told him about her interactions with her neighbors and did not seek to have a brief adjournment needed to have Mr. McAllister testify."  Reply at 10.  This claim is meritless.

As discussed *supra*, defense counsel did not become aware of the information contained in the P-73s until mid-trial, although he was indeed provided with the reports, *inter alia*, on the second day of jury selection.  Nonetheless, he was subsequently permitted to recall Huddleston and Pettigrew (which he did not do), and also was permitted to call Detective Evans and was granted leeway in questioning her with respect to the information contained in the P-73s.  T.T. 834.  Notably, the prosecutor commented that giving defense counsel the ability to question Detective Evans in this

manner was beneficial to the defense in that it "grant[ed] [defense counsel] the benefit of knowing that Detective Evans will relay that that was their conversation when frankly we don't know that Mr. McAllister would even say that." T.T. 833. The record reflects that Detective Evans subsequently testified and, in doing so, conveyed to the jury the information contained in the P-73s, namely that, prior to her death, the victim had mentioned to her husband that her neighbor across the hall had threatened her with a knife and that she had complained to him about the upstairs male neighbor. There is nothing in the record before this Court that suggests there was any other evidentiary value to Irving McAllister's statements, and Petitioner's after-the-fact contentions now that Irving McAllister may have been able to provide additional or different information that would have been beneficial to Petitioner's case are pure speculation. Thus, Petitioner has failed to demonstrate that he was provided with constitutionally ineffective assistance of counsel within the meaning of <u>Strickland</u>. This portion of Petitioner's ineffective assistance of counsel claim is meritless and is denied.

**(B)   Failure to "Adequately" Make Motion to Dismiss for Legal Insufficiency**

Petitioner claims that trial counsel was ineffective for failing to make an "adequate" motion to dismiss for legal insufficiency. This claim is meritless.

The record reflects that, at the close of the People's case, defense counsel moved for a trial order of dismissal, pursuant to CPL § 290.10.  T.T. 961.  In support of that motion, he argued "that the People have failed to present a prima facie case . . . there were no eyewitnesses to this case and that the physical evidence that they submitted with regard to boots prints and DNA evidence could be explained by the alleged admissions given by the defendant to law enforcement in that he did admit to being at the crime scene at one point.  And importantly . . . [Petitioner] never allegedly gave any admissions to committing the crime itself." T.T. 960-961.  Petitioner argues now that counsel's motion was inadequate because "[c]ounsel failed to address the elements of the crimes charged and the People's failure to prove each elements." Pet. at 23.  As Respondent point outs, Petitioner's claim fails insofar as he has failed to demonstrate -- or even allege for that matter -- how or in what way counsel's alleged failure was prejudicial.  Petitioner does not allege what element(s) of the crimes of which he was convicted that the People failed to prove beyond a reasonable doubt, or otherwise demonstrate how or in what counsel's motion was "inadequate" or in way explain how the evidence was legally insufficient to support his convictions for second-degree murder and third-degree criminal possession of a weapon.  In this respect, Petitioner has failed demonstrate that there is any probability that the outcome of his trial would have

been different had counsel "adequately" challenged the sufficiency of the evidence. This portion of Petitioner's ineffective assistance of counsel claim provides no basis for habeas relief and is therefore denied.

### (C) Failure to Adequately Cross-Examine and Challenge Credentials of Two of Prosecutions' Expert Witnesses

Petitioner claims that trial counsel was ineffective because he failed to adequately cross-examine and to challenge the credentials of the prosecution's expert witnesses, to wit: Schmitz, who testified about the footprints at the crime scene and Vertes, who testified as to the cause of death of the victim. This claim is also meritless.

"The conduct of examination and cross examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." Eze v. Senkowski, 321 F.3d 110, 127 (2d Cir. 2003) (citations and internal quotation marks omitted). Petitioner has failed to demonstrate that counsel's decisions with respect to the method/conduct of his cross-examination of Schmitz and Vertes were anything other than reasonable, strategic decisions made after careful consideration of the facts and circumstances of Petitioner's case.

In this case, Schmitz testified that she was a forensic chemist with extensive training and experience in footprint comparison, and stated that she was qualified in courts of law as

an expert in footprint comparison. T.T. 949. Schmitz clearly was sufficiently qualified, and her conclusion that the footprints found at the scene of the crime matched the soles of Petitioner's shoes was based upon the comparison analysis she performed with regard to the footprints that were found at the scene of the crime. T.T. 950. Notably, Petitioner has not explained how or in what way counsel could have specifically attacked the credentials of Schmitz. Rather, he asserts that counsel was ineffective because "[he] did not ask one single question in cross-examination of this witness." Mem. of Law at 24. The defense asserted by Petitioner at trial, however, was that someone other than Petitioner had murdered McAllister and that he had simply entered the victim's apartment after she was murdered because her door had been left open. Counsel's decision not to cross-examine Schmitz was therefore reasonable insofar as Schmitz's findings -- that the footprints at the crime scene matched the soles of Petitioner's shoes -- were consistent with Petitioner's defense that he entered McAllister's apartment but did not kill her.

Similarly, Vertes, the deputy chief medical examiner for Erie County, was a highly credentialed expert in the field of medicine, had conducted over 3,000 autopsies herself, and had testified "hundreds" of times in court. T.T. 870-871. Although Vertes did not personally perform the autopsy of the victim herself -- information that was elicited on direct examination and highlighted

on cross-examination -- she testified that an autopsy of the victim had been performed on April 19, 2007 in the medical examiner's office by a Dr. Baik, and that her conclusions with respect to the cause of the victim's death were based upon the report that Dr. Baik prepared in the normal course of business, her training and experience, and the autopsy performed.  T.T.  874-881.  Despite these qualifications, Petitioner appears to be arguing, as he did on direct appeal, that an in-depth cross-examination of Vertes was required since she did not personally perform the autopsy herself. See Pet. at 24; see also Pet'r Br. on Appeal, Point IV at Resp't Ex. B.  He appears to suggest that counsel should have done this by cross-examining Vertes on an alleged error that she made on a former murder case that she worked on as the medical examiner.  Id. Given that employing this line of questioning on a collateral issue would have been extremely prejudicial to the People's case -- possibly even grounds for a mistrial -- it was entirely reasonable for counsel not to have challenged Vertes's qualifications by raising her involvement in the unrelated case.  Accordingly, this portion of Petitioner's ineffective assistance of trial counsel is meritless and is denied.

In sum, the state court's adjudication of Petitioner's ineffective assistance of counsel claim was neither contrary to nor an unreasonable application of settled Supreme Court law.  The claim is meritless and is therefore denied in its entirety.

**V.    Conclusion**

-31-

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     June 26, 2012
           Rochester, New York

-32-